```
                    UNITED STATES BANKRUPTCY COURT
                     FOR THE DISTRICT OF NEW MEXICO

In re:
DANIEL WILLIAM COOK and
YOLANDA T. COOK,
     Debtors.                             No. 7-04-17704 SA

HYDROSCOPE GROUP, INC.,
HYDROSCOPE INC.,USA
UNIVERSAL CONSTRUCTORS, INC.,
U-LINER, INC. OF ARIZONA,
U-LINER, INC. OF UTAH,
D. W. CONSTRUCTION CO., INC.,
HYDROSCOPE CANADA INC.,
U-LINER, INC. OF NM,
     Plaintiffs,
v.                                        Adv. No. 07-1165 S

LINDA S. BLOOM, CHAPTER 11 TRUSTEE,
     Defendant.
```

**MEMORANDUM OPINION ON MOTION TO REOPEN**
**ADVERSARY FILED BY DANIEL W. COOK**

This matter is before the Court on Daniel W. Cook's ("Debtor") Motion to Reopen Adversary Proceeding, filed August 10, 2011. Doc 32. Mr. Cook is self-represented. The Motion to Reopen will be denied. This is a core proceeding concerning administration of the estate. 28 U.S.C. § 157(b)(2)(A).

This adversary caption has eight named corporate plaintiffs. The opening paragraph of the complaint then lists nine corporate plaintiffs, all eight in the caption plus Cook Construction Company, Inc. ("CCCI").

Paragraph 8 of the complaint states that Hydroscope Group, Inc. ("Group") has seven wholly owned subsidiaries, one of which

is HUSA (the Court assumes this is Hydroscope, USA); HUSA in turn had[1] one subsidiary HCAN (presumably Hydroscope Canada, Inc.).

Paragraph 9 states that HCAN was never owned by Group, nor been a subsidiary of Group.

Paragraph 10 alleges that in October, 2004, Debtor, as Chairman, CEO and President of Group and its seven wholly owned subsidiaries (including HUSA but excluding HCAN) executed a hand-written note that assigned all claims of Group and its subsidiaries against the Garrett group, Wells Fargo Bank and Hunt & Davis to the Debtor for $0.78 and the Cooks' personal assumption of the corporate debt of all of those entities. Exhibit 1 to the complaint, doc 1 p. 15, is a photocopy of the mostly illegible note, on a post-it, attached to a memorandum from Kenneth J. Mink, Bookkeeper of Hydroscope Group and Subsidiaries, to "Dan" (Debtor) dated February 21, **2005[2].** Exhibit 2 to the complaint, doc 1 p. 16, is a typewritten letter "To Whom It May Concern" signed by Daniel W. Cook, Chairman, CEO, President of all Corporations. It stated:

> For consideration paid, Hydroscope Group, Inc. and its subsidiaries, in the daily course of business, with the approval of Directors, sold, conveyed, granted, or otherwise assigned all past present and future title

---

[1] HCAN was sold to CBM Group, Inc., a Nevada corporation, post-petition on July 27, 2005. See Adv. No. 07-1038 complaint.

[2] For the purposes of this Memorandum Opinion, the Court will assume that the complaint's allegations are true, i.e., that the assignment and assumption took place in October, 2004.

right and interest in and to any and all of its claims
and causes of action against Garrett Capital, LLC,
Scott Garrett, Catherine F. Davis, Esq., Hunt & Davis,
P.C., Wells Fargo Bank a/k/a Wells Fargo Bank New
Mexico, N.A.'s, to and including the parent or parents
of Wells Fargo Bank, to Daniel W. and Yolanda T. Cook
individually.

Paragraph 11 claims that the Debtors' schedules of debt included all debts of Group and the two subsidiaries that had debt, HUSA and CCCI. It also alleges that the schedules specifically excluded debts of HCAN including those to the University of Alberta and to the law firm of Christensen O'Connor Johnson Kindress. As proof, paragraph 11 cites to the original statements and schedules in the main case, doc 14 (November 26, 2004), and to later amendments, docs 94 (May 27, 2005) and 216 (August 19, 2005).[3]

---

[3]The contents of the schedules and statements themselves are not really that relevant to the issue under consideration. Rather, they demonstrate an unexplained flow of assets from one place to another, unexplained decreases in values of claims one day worth one million dollars turning into claims for one dollar the next, and a steadily and rapidly increasing estimation of the value of businesses and claims against others. The continuously changing landscape coupled with bizarre legal theories have permeated this no asset chapter 7 case for seven years.
   The original schedule B listed a stock interest in Hydroscope Group Series A-Preferred with a value of $2,000,000 and an interest in Hydroscope Group-Common Stock with a value of $1. Schedule B, item 20, listed other claims against: Eastern Savings Bank, value $150,000; Wells Fargo Bank for fraud ($1,014,559), destruction of property, business interference and fraud ($2,700,000) and treble damages ($8,100,000); and Scott Garrett for fraud and other torts ($1,500,000) and damages for business destruction ($10,000,000). Nowhere does this Schedule B or any Amended Schedule B ever state that some or all of the claims against others were transferred to Debtor for $0.78 and
(continued...)

Case 07-01165-s   Doc 35   Filed 10/11/11   Entered 10/11/11 10:40:43 Page 3 of 19

The first claim for relief seeks 1) a declaration that HCAN's claims were never transferred to the Cooks and therefore never estate property, and 2) entry of a judgment against Ms. Bloom in an amount to be proven for damages HCAN has sustained as a result of "her actions". The second claim for relief seeks 1) a declaration that "defenses against any claims that may be

---

³(...continued)
his guarantee of corporate debts in the millions of dollars. Original Schedule D listed 11 secured debts totaling $3,135,000 of which 10 are "disputed". The single undisputed secured debt was $13,376 owed to New Mexico for a personal income tax lien. Original Schedule E listed one disputed priority tax debt to IRS for $125,863. Original Schedule F listed 26 unsecured debts totaling $3,141,000 of which 19 are "disputed." The remaining undisputed unsecured debts total $235,659 plus two "undetermined." On Schedule H, Group, HUSA and Cook Construction Company, Inc. are listed as codebtors.

The first amendment was to Schedule B only. It included an account receivable from Group in the amount of $1,017,000 that had inadvertently been omitted.

The second amendments were extensive. On Schedule B, the Group Preferred stock's value dropped without comment or explanation from $2,000,000 to $1. A new stock was listed, CBM Group (the corporation that acquired HCAN postpetition) with a $1 value. The account receivable from Group dropped value from $1,017,000 to $1. A new claim against Spica Properties for fraud and conversion was listed at $500,000. The total claims against Wells Fargo rose from $11,814,559 to $450,000,000. The claim against Scott Garrett (and his attorneys) rose from $11,500,000 to $35,000,000. This Schedule B also lists an interest in CBM and Group's IP at $21,000 and a proposed license to CBM valued at $10,000,000. Schedule E now listed a new $13,776 claim of New Mexico, and no longer disputed the IRS claim of $125,536. Amended Schedule F omits a liability arising under a personal guarantee to Wells Fargo that appeared at $2,208,000 on the original schedules, as well as a Bank One credit card in the amount of $9,018. About a dozen formerly disputed claims are no longer disputed. What is surprising, however, it the appearance of twelve large claims (totaling $3,578,000) that mostly appear to be liabilities for guarantees of corporate debts that presumably the Debtor assumed before filing the case.

brought against" Group, its subsidiaries, and HCAN were never transferred to the Cooks and therefore never estate property[4], and 2) entry of a judgment against Ms. Bloom in an amount to be proven for damages that Group, the subsidiaries and HCAN have

---

[4]This is one of the bizarre legal theories referenced in footnote 3. Exhibit 2 to this adversary proceeding, doc 1 p. 16, is an after-the-fact letter written by Mr. Cook to explain that Hydroscope Group, Inc. and its subsidiaries, sold, conveyed, granted, or otherwise assigned all past present and future title right and interest in and to any of its claims and causes of action against [various parties] to the Cooks, individually. From this statement the Debtor argues that only claims were assigned, but defenses to claims arising from those same parties remained in the assignors. Neither Plaintiffs nor Debtor have pointed out any authority for this proposition, nor has the Court found any. Debtor's best argument is that if the assignment were of claims and defenses, it would have stated so. The Court's answer to this is that if the assignment were of claims without related defenses, it would have stated so. An example of how this could play out is as follows: Assume that in a particular state, usury is a defense to payment of a mortgage and also provides a cause of action for damages. Assume also that the state has a provision exempting licensed mortgage bankers from the operations of the usury laws. A, a licensed mortgage banker in the state, makes a high interest loan to individual B, who grants to A a mortgage on his property. A then, for adequate consideration, sells, conveys, grants, or otherwise assigns all past present and future title right and interest in and to any of its claims and causes of action against B to an individual C. (The hypothetical facts to this point are taken from <u>Galatti v. Alliance Funding Co., Inc.</u>, 228 A.D.2d 550, 644 N.Y.S.2d 330, 331 (Ct.App. 1996)). If B then defaults and C files suit for money due and to foreclose the mortgage, B can defend with usury as a defense and counterclaim against C for damages. If C has not been assigned A's "defenses" it could not claim exemption from the usury laws, could not foreclose and might be liable for damages. (In the actual case, the appellate court had no trouble finding that defendants, as lawful assignees of the mortgage were entitled to assert the exemption.) Furthermore, it is likely that future litigation regarding the defense would be barred by res judicata as something that should have been litigated in the first suit. <u>Blea v. Sandoval</u>, 107 N.M. 554, 558, 761 P.2d 432, 436 (Ct.App.), <u>cert. denied</u>, 107 N.M. 413, 759 P.2d 200 (1988).

Case 07-01165-s    Doc 35    Filed 10/11/11    Entered 10/11/11 10:40:43 Page 5 of 19

sustained as a result of her actions.  The third claim for relief states that the purpose of the prepetition transfer of claims to Mr. Cook was to allow him to pursue the claims while in bankruptcy, and then he would use the proceeds of the litigation to pay off corporate creditors.  Doc 1, p. 13.  Count 3 further states that Ms. Bloom interfered with a means to pursue and secure funds to pay off corporate creditors and has thwarted the whole purpose of the transfer of claims to the Cooks, so she should be ordered to abandon the claims.

**RELEVANT BACKGROUND**

　　The Debtors filed a Chapter 11 petition on November 21, 2004.  They continued in possession of the estate.

　　On June 2, 2005, Wells Fargo filed a motion to appoint trustee.  Doc 96.  On July 19, 2006 the Court entered an Order directing the United States Trustee to appoint a case trustee. Doc 366.  On August 16, 2006, Linda Bloom accepted appointment as the Chapter 11 Trustee.

　　On February 14, 2007 (doc 503) the Chapter 11 trustee, Wells Fargo, and the Garretts filed a Motion to Approve Compromise under Rule 9019, which, if approved, would settle all the litigation pending in federal and state court regarding all of the parties.  The automatic stay would be terminated, the estate's stock interests and intellectual property interests would be transferred to Garrett, Garrett would pay Wells Fargo a

certain amount, the state court would foreclose the liens on the properties, and some amount of funds would be made available to the estate. The compromise was conditioned, in part, on the estate's ownership of certain assets. To obtain some of those assets, the Chapter 11 Trustee executed and delivered to CBM Group a Notice of Reversion of certain assets that it had purchased from HCAN on July 27, 2005. See Adv. No. 07-1038 complaint.

On March 6, 2007, CBM Group filed an adversary seeking a declaratory judgment that the estate did not own the assets on which the trustee was claiming a reversion. Adv. No. 07-1038. On January 31, 2008, the Court entered a judgment in the adversary:

> **IT IS HEREBY DECLARED** that neither the Cook bankruptcy estate nor Linda Bloom, Trustee of the Cook bankruptcy estate, or any person claiming through them has any right, title or interest in or to that certain intellectual property which was conveyed by Hydroscope Canada, Inc. to CBM Group, Inc. by agreement made on January 25, 2005, effective as of January 28, 2005 and executed on June 17, 2005.

On February 14, 2008, the chapter 11 trustee resigned. Main case, doc 674. The Court had a pretrial conference in this adversary on April 17, 2008 (doc 23 minutes) at which it heard arguments from Plaintiffs why the claims against the Trustee should not be dismissed for failure to comply with the Barton[5]

---

[5]Barton v. Barbour, 104 U.S. 126, 128 (1881)("It is a
(continued...)

doctrine.  At about this time the Court also terminated the
automatic stay with respect to all parties and all property
interests involved, to be litigated in an ongoing state court
proceeding.  Therefore, on April 21, 2008, the Court entered an
Order Dismissing Adversary Proceeding without Prejudice.  The
Order specifically states that if the Plaintiffs pursued a
hearing on a Barton motion, the case could be refiled against the
trustee.  As to the other claims, there was no need for this
adversary to continue because the state court was dealing with
all the issues.  On May 1, 2006, Plaintiffs filed a motion to
reconsider the dismissal order.  Doc 27.  They argue that they
should have been allowed to pursue Barton relief in the main
case, and to name the new trustee before dismissal.  They also
argued that it was premature to dismiss because the outcome of
the state case was uncertain and might not resolve all issues.

   On May 6, 2008 the Court denied the Motion to Approve Rule
9019 controversy.  Main case, doc 746.

   On October 15, 2008, the Court granted the Motion for
Reconsideration.  Doc 27.  Its first paragraph states: "The

---

⁵(...continued)
general rule that before suit is brought against a receiver leave
of the court by which he was appointed must be obtained."); Sherr
v. Winkler, 552 F.2d 1367, 1374 (10th Cir.1977)(Leave of the
appointing court must be obtained before suing a receiver or
trustee in bankruptcy.)(citing Barton v. Barbour, 104 U.S. 126
(1881).

Page -8-

Case 07-01165-s    Doc 35    Filed 10/11/11    Entered 10/11/11 10:40:43 Page 8 of 19

motion for Reconsideration will be granted <u>as set out in this order</u>." (Emphasis added.) The decretal portion stated:

> **IT IS THEREFORE ORDERED** as follows:
> 1. The dismissal order (doc 24) is set aside;
> 2. <u>Plaintiffs must amend the complaint to name the current chapter 7 trustee as the defendant for all purposes</u>;
> 3. <u>After conferring with opposing counsel to see if the motion is opposed, Plaintiffs must request a hearing on the Motion for Leave to Expand or Amend Suit Against Trustee Bloom in her Official Capacity, not Individually (doc 664)</u>; and
> 4. The parts of this adversary proceeding which seek a ruling on the ownership of the claims and defenses are stayed until the State District Court litigation is completed, consistent with the stay orders entered in the main case, until and unless the Court rules otherwise.

(Emphasis added.) After October 15, 2008, the only thing that happened was the withdrawal of Plaintiffs' attorney. No amended pleadings were filed. The new trustee was not substituted in. No request for hearing was made in the main case to determine the scope, if any, of a trustee's liability.

When the Court denied the Rule 9019 compromise motion, all of the issues in this adversary proceeding were mooted. If the trustee was no longer attempting to sell assets allegedly belonging to others, there was no need for an order preventing that sale. If the Plaintiff corporations wanted to sue the trustee, they could seek to do so by filing a motion in the main case. They did not. This adversary was therefore closed as moot on July 29, 2011, without any notice of forthcoming dismissal.

On August 10, 2011, Mr. Cook filed a Notice and Disclosure. Doc 34. In it, he discloses that the Plaintiffs in this case, except for HCAN, transferred causes of action to him prepetition which were included on his Schedule B. He also states that he believed that trustee Montoya abandoned all assets to him on July 1, 2009 by virtue of his stating that he would abandon assets. Doc 844. On August 9, 2011, this Court entered an Order declaring that the trustee's proposed abandonment would not be effective until the case closed. Debtor also argues that the Court has reversed its position[6] from that stated in In re Seck,

---

[6]The Court has reviewed its decision in In re Seck and finds no conflict with its decisions in this case. In Seck the case trustee filed a report of no distribution and abandonment of assets. The case then closed. This Court noted that, in general, abandonments are not reversible. Under section 544(a), a trustee may abandon property "after notice and a hearing" or under section 544(b) the court may order abandonment on request of a party in interest "after notice and a hearing." Otherwise, if the case closes without a scheduled asset being administered by the trustee the scheduled asset is deemed abandoned. Section 544(c). Otherwise, property not abandoned or administrated remains property of the estate unless the court orders otherwise. Section 544(d). In Seck, the Court also noted that the section 341 meeting notice provides that a trustee may effect an abandonment under section 544(a) without notice and hearing if no requests for notices of proposed abandonments are filed with the court. The Court did not state the obvious that if actual objections to abandonment are filed, the trustee may not abandon without a notice and hearing and an order.
  In the Cook bankruptcy, the first issue of abandonment was the Debtors' Motion to Compel Abandonment, doc 578, filed July 25, 2007. The Chapter 11 Trustee, Wells Fargo, and the Garrets filed a joint objection on August 9, 2007. Doc 587. From this point on, there were existing objections to abandonment in the record, so no assets could be abandoned without "notice and a hearing." No orders were entered authorizing abandonment. The
(continued...)

No. 7-05-21255-SS (Bankr. D. N.M. Memorandum Opinion January 19, 2007). Debtor further argues that because the trustee misrepresented to everyone that the assets had been abandoned (doc 844) the corporate entities relied on that misrepresentation to not pursue this adversary (and, by the way, another adversary they had filed against trustee Montoya and allowed to be dismissed for want of prosecution, Adv. 08-1099, dismissed March 17, 2010). Debtor states that "Cook will pursue the damages by the alleged false allegations of alleged estate ownership of HCAN's causes and exclusive ownership of all the corporate entities [sic] defenses." Finally, he argues that the adversary case was "improvidently closed" without notice to Cook.

**DECISION**

This motion is not well taken for many reasons. First, and easiest, is the fact that Cook was not a party to this adversary proceeding and was not entitled to any notice.

Second, this adversary proceeding was dismissed as much for being abandoned and unprosecuted as it was for being moot.

---

[6](...continued)
Cook case has not closed. Therefore, no assets have been abandoned. Mr. Cook has challenged this ruling on numerous occasions, but the Court has steadfastly ruled that nothing has been abandoned.
  In Seck the trustee filed a notice of abandonment and the case closed. Under section 544(c) the scheduled assets were abandoned. In Cook, the case has not closed; there are objections to abandonment, and no orders have allowed abandonment. Seck is not binding on, persuasive, or even relevant to the Cook case.

> The authority of a federal trial court to dismiss
> a plaintiff's action with prejudice because of his
> failure to prosecute cannot seriously be doubted. The
> power to invoke this sanction is necessary in order to
> prevent undue delays in the disposition of pending
> cases and to avoid congestion in the calendars of the
> District Courts. The power is of ancient origin,
> having its roots in judgments of nonsuit and non
> prosequitur entered at common law, e.g., 3 Blackstone,
> Commentaries (1768), 295-296, and dismissals for want
> of prosecution of bills in equity, e.g., id., at 451.

Link v. Wabash Railroad Co., 370 U.S. 626, 629-30 (1962)(footnote omitted).

> The authority of a court to dismiss sua sponte for lack
> of prosecution has generally been considered an
> 'inherent power,' governed not by rule or statute but
> by the control necessarily vested in courts to manage
> their own affairs so as to achieve the orderly and
> expeditious disposition of cases.

Id. at 630-31 (footnote omitted.) See also Securities and Exchange Commission v. Power Resources Corp., 495 F.2d 297, 298 (10th Cir. 1974):

> A trial court may, on motion of a defendant or on
> its own motion, dismiss an action for failure of the
> plaintiff to prosecute it with reasonable diligence.
> Rule 41(b), F.R.Civ.P. See also Link v. Wabash R. Co.,
> 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). Such
> a dismissal is within the trial court's sound
> discretion and should be sustained absent an abuse of
> that discretion. Food Basket, Inc. v. Albertsons,
> Inc., 416 F.2d 937 (10th Cir. 1969).
> There is no precise rule as to what circumstances
> justify a dismissal for failure to prosecute. Instead,
> the procedural history of each case must be examined to
> make such a determination.

(holding that a three year delay was sufficient.) In this case, there was an order entered on October 15, 2008 reopening the

Page -12-

case. As of July 29, 2011 the case did not move. This delay was sufficient to justify closing the case for want of prosecution.

Third, a trial court may properly dismiss a case if a plaintiff fails to comply timely with a court order. <u>LaFleur v. Teen Help</u>, 342 F.3d 1145, 1150 (10th Cir. 2003). <u>See also</u> <u>Vazquez-Rijos v. Anhang</u>, ___ F.3d ___, 2011 WL 3596733 (1st Cir. 2011):

> In order to operate effectively and administer justice properly, courts must have the leeway "to establish orderly processes and manage their own affairs." <u>Young v. Gordon</u>, 330 F.3d 76, 81 (1st Cir. 2003). As such, trial courts have substantial authority to impose sanctions, including dismissal, against a party for noncompliance with various procedural rules and court orders. <u>Id.</u>

The October 15, 2008 order ordered Plaintiffs to amend the complaint to name the current trustee and to obtain a hearing on their motion to authorize them to sue the trustee. They did neither. The fact that there was no time limit imposed in the order is not relevant. If an order does not require compliance by a date certain, then it is interpreted to require compliance within a reasonable time. <u>Flinn v. Rains (In re Rains)</u>, 338 B.R. 99, 103 (Bankr. E.D. Cal. 2006). Thirty three months was not a reasonable time in this case. Next, the fact that Plaintiffs' attorney withdrew shortly after entry of the order does not give Plaintiffs an automatic extension of time to comply. <u>Gruenwald v. Missouri Pacific Railroad Co</u>, 331 F.2d 983, 987 (8th Cir. 1964)(citation omitted.) Finally, this was not just an ordinary

order that Plaintiffs ignored.  This order was entered with the direction that the adversary case would be reopened "as set out in this order."  In other words, the reopening was contingent on Plaintiffs compliance with the requirements of the Order.  When Plaintiffs ignored the Order's requirements, the adversary was properly reclosed.

Fourth, Debtor states that "Cook will pursue the damages by the alleged false allegations of alleged estate ownership of HCAN's causes and exclusive ownership of all the corporate entities [sic] defenses."  In other words, Debtor seeks to use Bankruptcy Court resources to avenge claimed harms to corporations that were not bankruptcy debtors.  The Bankruptcy Court lacks jurisdiction over these causes of action which are unrelated to bankruptcy and which will yield nothing for unsecured creditors.  Additionally, Mr. Cook received his discharge.  There is no provision in the Bankruptcy Code that gives discharged debtors the broad trustee-like powers that Mr. Cook desires.

Fifth, to the extent that the subsidiaries and Group transferred their rights to Mr. Cook prepetition, those rights passed to the estate upon filing.  Therefore, after filing the Chapter 11, the subsidiaries and Group no longer had standing to attempt to interfere with the trustee's administration of those rights.  As President and CEO of the subsidiaries and Group, Mr.

Cook attempted in this adversary proceeding to impede and impair the trustee's attempted resolution of the case that would have yielded a dividend (admittedly small) to the creditors by obfuscating ownership of claims and "defenses" and threatening personal liability to the trustee if she pursued her duties under the Bankruptcy Code.  Also, to the extent Group and subsidiaries asserted residual rights where there were none they were in direct violation of the automatic stay by asserting control over estate assets.  11 U.S.C. § 362(a)(3).  Actions taken in violation of the automatic stay are void.  <u>Franklin Savings Assoc. v. Office of Thrift Supervision</u>, 31 F.3d 1020, 1022 (10th Cir. 1994).  And allowing Debtor to reopen this case (to which he was never a party) would not be just.

Finally, as an observation and not as a ruling, the Court would find that reopening would be pointless.  As discussed above, the injunctive relief is moot because no trustee is attempting to sell anything.  The only damage claim is premised on the trustee's false claim of ownership of assets of others, with resulting damages that would have been proved at trial.  This is an acceptable and recognized cause of action in New Mexico, <u>see, e.g.,</u> <u>Gregory Rockhouse Ranch, L.L.C. v. Glenn's Water Well Service, Inc.</u>, 144 N.M. 690, 696, 191 P.3d 548, 554, 2008-NMCA-101, {17}:

> "Slander of title occurs when one who, without the privilege to do so, willfully records or publishes

matter 'which is untrue and disparaging to another's
property rights in land as would lead a reasonable man
to foresee that the conduct of a third [person as]
purchaser might be determined thereby.'" Vill. of Wagon
Mound v. Mora Trust, 2003–NMCA-035, ¶ 74, 133 N.M. 373,
62 P.3d 1255 (emphasis added) (quoting Den-Gar Enters.
v. Romero, 94 N.M. 425, 430, 611 P.2d 1119, 1124
(Ct.App.1980)).

And, the cause of action is not limited to damages to land.

> Under the facts of this case, the tort committed
> by Ruiz is also akin to slander of title, a form of
> tort that Professors Prosser and Keeton call by the
> generalized name, "injurious falsehood." [W.P. Keeton,
> D. Dobbs, R. Keeton, D. Owen,] Prosser and Keeton [on
> the Law of Torts] § 128 [(5th ed. 1984)]. "For the
> most part the injurious falsehood cases have been
> concerned with aspersions upon the title to property *
> * *. Any type of legally protected property interest
> that is capable of being sold may be the subject of
> disparagement, including land * * *." Id. at 965.
> "The gist of the tort is the interference with the
> prospect of sale or some other advantageous relation."
> Id. at 966.

Ruiz v. Varan, 110 N.M. 478, 480-81, 797 P.2d 267, 269-70 (1990)

(footnote omitted.)  See also Restatement (Second) of Torts §

623A (1977):

> One who publishes a false statement harmful to the
> interests of another is subject to liability for
> pecuniary loss resulting to the other if
>     (a) he intends for publication of the statement to
>     result in harm to interests of the other having a
>     pecuniary value, or either recognizes or should
>     recognize that it is likely to do so, and
>     (b) he knows that the statement is false or acts
>     in reckless disregard of its truth or falsity.

and id. § 629:

> A statement is disparaging if it is understood to cast
> doubt upon the quality of another's land, chattels or
> intangible things, or upon the existence or extent of
> his property in them, and

Page -16-

(a) the publisher intends the statement to cast
                the doubt, or
                (b) the recipient's understanding of it as casting
                the doubt was reasonable.

But, the Plaintiffs' complaint totally ignores the fact that the Trustee's actions were taken in furtherance of her position as a bankruptcy trustee that had initiated litigation (the Rule 9019 motion). This cloaks her actions with absolute immunity.

> "An absolute or unqualified privilege means absolute immunity from liability for defamation." Neece v. Kantu, 84 N.M. 700, 705, 507 P.2d 447, 452 (Ct.App. 1973). Generally, statements made in the course of judicial proceedings enjoy an absolute privilege from later charges of defamation or slander of title. Superior Constr., Inc. v. Linnerooth, 103 N.M. 716, 719, 712 P.2d 1378, 1381 (1986); and see generally Restatement (Second) of Torts § 635 (1977) (providing that the varieties of absolute privilege which apply to defamation also apply to the tort of injurious falsehood—i.e., slander of title). Under appropriate circumstances, this privilege applies even to statements made outside the proceedings themselves:
>> It is not absolutely essential, in order to obtain the benefits of absolute privilege, that the language claimed to be defamatory be spoken in open court or contained in a pleading, brief, or affidavit.... If the alleged defamatory statement is made to achieve the objects of the litigation, the absolute privilege applies even though the statement is made outside the courtroom and no function of the court or its officers is invoked.
> Romero v. Prince, 85 N.M. 474, 477, 513 P.2d 717, 720 (Ct.App. 1973) (alteration in original) (internal quotation marks and citation omitted).

Gregory Rockhouse Ranch, L.L.C., 144 N.M. at 696, 191 P.3d at 554. See also Superior Construction, Inc. v. Linnerooth, 103 N.M. 716, 719, 712 P.2d 1378, 1381 (1986)("New Mexico courts have long recognized the absolute privilege accorded judicial

proceedings.")(citations omitted.); Neece v. Kantu, 84 N.M. 700, 705, 507 P.2d 447, 452 (Ct.App.), cert. denied, 84 N.M. 696, 507 P.2d 443 (1973):

> [A]bsolute immunity does apply to defamatory matter in judicial pleadings, even if false and malicious, when the defamatory matter is reasonably related to the subject of inquiry.
> An absolute or unqualified privilege means absolute immunity from liability for defamation. It has been confined to very few situations where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives. It is generally limited to judicial proceedings, legislative proceedings, executive communications, consent of the plaintiff, husband and wife, and political broadcasts.

(Citations omitted.) And, the immunity also extends to protect statements made even if litigation is only under "serious consideration." Helena Chemical Co. v. Uribe, 149 N.M. 789, 794, 255 P.3d 367, 372, 2011-NMCA-060, {18} (Ct.App.), cert. granted, (June 08, 2011).

## CONCLUSION

For all of the above reasons, the Court finds that Debtor's Motion to Reopen is not well taken and should be denied. The Court will enter a separate Order denying the Motion.

*[signature]*

Honorable James S. Starzynski
United States Bankruptcy Judge

Date entered on docket: September 11, 2011

Copies to:

All Plaintiffs Listed
c/o their former attorney
William J. Waggoner
529 W San Francisco
Santa Fe, NM 87501

Daniel William Cook
Interested party
920 Galeras Street NW
Albuquerque, NM 87120

Linda S. Bloom
Defendant
PO Box 218
Albuquerque, NM 87103-0218

United States Trustee
P.O. Box 608
Albuquerque, NM 87103